22-3648 Union Pacific Railroad v. Surface Transportation Board et al. and 23-1325 Association of American Railroads v. Surface Transportation Board et al. Mr. Dupree, when you are prepared, please proceed. Thank you, Your Honor, and may I please the Court, Tom Dupree, on behalf of petitioners. The Surface Transportation Board historically has exercised its statutory duty to adjudicate rate disputes and set, in appropriate cases, the maximum reasonable rate using a traditional model of agency adjudication. The Board has long recognized that it has a duty in performing this task to take into account all the statutory factors that Congress has established to guide the Board in exercising its independent expert judgment in reaching a result and setting with precision a rate that not only does justice to the parties in the dispute before the Board, but that serves the public interest. Last year, the Board said, enough of this traditional model. We're going with baseball arbitration. The Board's resulting scheme, what it calls Final Offer Rate Review, or by its acronym, F.O.R., intentionally disables the Board from exercising its statutory duty to consider these factors, take the public interest into account when setting a rate. Under F.O.R., the Board is required to accept whichever one of the parties' final offers comes closest to what the Board, had it exercised its independent judgment, would have determined is the legally correct rate that best serves the public interest. F.O.R. is plainly contrary to law, and we ask this Court to vacate the Board's final rule adopting F.O.R. Let me begin by addressing the government's main defense of F.O.R. before this Court. The government says, Congress hasn't specifically prohibited us from deciding cases using baseball arbitration, and we would submit that gets it exactly backward. The Supreme Court has said time and again, particularly so in recent years, that federal agencies are creatures of Congress that can only exercise those powers that Congress, pursuant to its Article I power, has delegated to the agency to exercise. Here, Congress has not authorized the Board to decide cases and set rates using this baseball arbitration procedure. In fact, what Congress has enacted, the statutes that govern the Board's duty in this respect, preclude the Board from using this final offer process to decide rates. I think maybe the place this is most visible and most evident is in the statutory requirement that the Board act in the public interest. This is in the United States National Rail Transportation... type of disposition. Something less complicated and expensive that small shippers could afford to challenge the rates with. Judge Smith, that's right. That was the Board's rationale for adopting what, in its own words, it described as an innovative approach to resolving these types of smaller disputes. But much as we can like and respect innovation, innovation is bounded by law. And here, the Board has clearly exceeded the legal boundaries in adopting this procedure. The place I think it's probably most evident is in the Board's statutory duty to enact rates or set rates, again, when warranted, that serve the public interest. But the way forward is structured. The parties will each tender their own final offer. These are two economically self-interested parties. The shipper will tender an offer that presumably serves the needs of the shipper. The railroad, on the other hand, will tender an offer that serves the needs of the railroad. But what if the public interest is served by a rate in between the two? The Board has no answer to this. It can't select that rate. It cannot perform the very duty with which Congress has entrusted it to set rates that serve the public interest. I think it's also very difficult for the Board, frankly, to take into account and to give due consideration to the vast panoply of additional factors that Congress has specified. There are the so-called long-canon factors, which are three economic factors the Board needs to consider. There are nearly a dozen, more than a dozen, factors set forth in the United States rail transportation policy. There's the revenue adequacy factor specified in 10704. None of this can fully be taken into account by the Board when it has intentionally confined itself, it has intentionally limited and restricted the possible decisional outcomes to the two proposals offered by the parties. I'm wondering if it might be a little bit more nuanced than that, though, because as I understand it, when the parties submit their two proposed rates, they have to do so based on statutory and economic principles. Doesn't that prohibit them from just, well, doesn't it cabin the decision of the Board to choosing between two rates that are based on statutory and economic principles? And if the shipper fails to do that, they dismiss the claim. Well, Your Honor, I don't think that's kind of how it would work in practice. In other words, even if each party dutifully attempts to integrate the statutory principles when they are formulating their offer, for one thing, they might not do so successfully. They might think they have done so, but perhaps the Board, again, if it had the discretion to conclude otherwise, might say, look, nice try, you know, shipper proposing a $5 rate, but we don't think that fairly encapsulates the statutory principles. But in that universe, Your Honor, the Board would still be compelled to accept that offer or the offer of the railroad, which potentially could suffer from the same flaws. The fact that the Board has limited its options to just these two proposals submitted by the parties is clearly contrary to what Congress envisioned when it created the Surface Transportation Board, going back to the 1940s and the Board's predecessor, the Interstate Commerce Commission, where the Supreme Court in the famous Kansas City Stockyards case said that the ICC is really a paradigm of good government agencies because it's staffed by experts who know this issue and they will bring their informed judgment and their expert wisdom to bear in resolving these important questions that are leading with such a heavy public purpose and public interest in maintaining the viability of a national rail system in the United States. That's why we have these experts at the helm. Isn't there a floor on what rate a shipper can propose based on a formula? There is, Your Honor. There is a floor. It concerns kind of average variable cost and that sort of thing. So there is a floor. How does it relate to this process? Well, I don't think it ultimately has a bearing one way or the other. I mean, if the shipper proposes a number that is, you know, slightly above the floor, I mean, again, the Board presumably would be entitled to choose that number over the railroad's contrasting number. I mean, frankly, it's difficult to see how that scenario even would play out. I mean, if the Board is saying we wouldn't even consider an offer that's below the floor, then it seems as though that situation is very unlikely to arise and that the shippers simply would submit an offer, you know, even conceivably a lowball offer that nonetheless exceeds the floor. The railroads, of course, as we point out in our brief, are in a vastly different position because they bear all the risk. For the railroads, the binary outcome is basically maintaining the current rate or, God forbid, the Board could approve the shipper's potentially lowball offer, even if the Board's rate is just a hair above what the Board considers reasonable. If the railroad is charging $100 and the shipper and the railroad comes in and says, we say $100, and even if the Board thinks that the correct rate is $99, it can't take the railroad's offer. It's going to go to the shipper's offer, which could be $2 for all we know. So for this reason, this scheme, in addition to its manifold legal flaws and the unconstitutional vagueness that pervades it, is excessively coercive, unfairly so, to the railroads. Let me say a few words about vagueness. The Court doesn't need to reach our vagueness arguments if it agrees with our threshold argument that the Board simply lacks statutory authority to enact this scheme, but I do want to say a few words about vagueness because I think it's a separate, independent, distinct constitutional flaw in this scheme. Under the Board's approach, the parties choose their own methodology. Don't think I'm overstating. This is a radical approach to agency adjudication. We call it a choose-your-own-adventure approach in our brief. But what it really is is choosing your own legal standard. In every four cases, the Board, in addition to parties concocting and tendering their own offers, will prepare and concoct and submit their own legal standards. The Board, of course, is not going to tell anyone in advance what the governing legal standard is going to be, which I think as a practical matter makes it difficult if you're in the railroad in the business of trying to figure out what a lawful rate is to charge. You don't know what the legal standard by which your conduct will be adjudicated will be. And what the Board says is that each party will tender its proposed legal standard, and then at the end of the case, when the Board announces its decision, it will pull the curtain off and reveal the winning legal standard. That is blatantly unconstitutional. There is no Federal agency in the long history of the administrative state, in the long and robust history of American law, that has adopted a scheme anything like this. It is grossly unconstitutional. So for those reasons, Your Honor, we believe that... Is there any other regulatory agency, Federal or State, that has adopted something in the nature of four for the setting of rates? There's not, Your Honor. I think the closest analogs that the government has identified, and in the final rule, by the way, I believe it's note 22, the Board acknowledges that there's no precedent for this. I think the closest they've come is they point out that in some of their existing rate methodologies, there is one particular component of one particular step that incorporates this sort of final offer proceeding. But as the Board itself acknowledged when it issued the final rule, that is completely distinguishable from what we have here, where the final offer process is the entire framework of decision, rather than a small element of one particular component in a vast and massive structure. The other analogy the Board has rolled out is they point out that Canada, Canada's rail system uses a process, they say, that is similar to this one. And then we pointed out that there's a pretty big difference, that the Canadian legislature has authorized the Canadian rail authorities to use this system. So we think, in fact, this actually proves our point. Because even the Board says, well, the other agencies do it with statutory authorization. Here, the Board has no statutory authorization to do what it did here. I'll reserve the remainder of my time. Thank you, Mr. Dupree. Mr. Vanden Heuvel. Thank you. Good morning, Your Honours. Drew Vanden Heuvel for the government. This is a case about an agency trying to do its job. Railroads have monopoly pricing power over captive shippers. To protect those shippers, Congress required that the Board create procedures for hearing rate cases. The ICC did that for large rate cases, but it knew, even at the time, that those procedures would be too costly and too cumbersome to make sense for small cases. I think it's probably not disputed that they're trying to do their job, but where's the authorization for the method of four? The authorization is in 10704A1, which says that the Board may prescribe the maximum rate. That's in conjunction with Section 1321, which says that the Board shall carry out the previous section I mentioned, and it has expressed statutory authorization to enact rules to do so. So this is not inferring a new agency power from statutory silence. Congress was explicit here. Congress said the Board needs to decide rate cases. It said the Board needs to decide small rate cases. It said that after a shipper wins a rate case, the Board may prescribe the maximum rate. Could they have simply chosen a coin flip? No, I don't think so. They could probably choose heads or tails and flip it. There are a few problems that would exist with that scheme. One, I can't really imagine a justification that the Board could give for enacting a scheme like that. I think it would also run afoul of the APA general reason decision-making requirements, right? There would be no explanation for the agency's decision. Well, how different, and obviously it is different, but you've got a basic A, B, shipper says one thing, railroad says another, and it's going to be one or the other. It is pretty fundamentally different. I agree with that, Your Honor. One premise I'd like to address is that it has to be one or the other. The railroad keeps saying this, that it defines the decisional options to just one of the two offers, and that's not accurate. Okay. Help us. Show us how it's different. So in the merit stage, there is no final offer constraint on the Board's decision-making. It's just the shipper has the burden of demonstrating that the challenge rate is unreasonable, and then the Board evaluates that as in any normal case. The only way you get even to the remedy stage at all is if the Board has decided that the shipper has carried its burden and has sort of approved that method as being a legitimate method of determining what the maximum reasonable rate should be. So that's one exercise of judgment that wouldn't exist in a pure coin flip situation. The other is, of course, when you get to the remedy stage, the Board has a choice between the two offers. It's not flipping a coin. It is consulting its policy judgment and consulting the various statutory factors, deciding which of these two options best achieves those goals. Obviously, that can't happen in a coin flip situation. Another big difference is that in the coin flip situation, the Board wouldn't be hearing from the parties or taking their concerns into account. It would be purely random. And obviously, under final offer rate review, the parties do get to have a say in what the outcome is. I mean, that's almost the problem. Railroads say that they have too much say. So I just don't think it's a very fair comparison to compare final offer rate review to a coin flip. So, Counsel, under this process, the Board initially determines that the current rate is unreasonable. That's before you get to the remedy stage. At the remedy stage, could the Board then choose an unreasonable rate offered by the shipper, or must it dismiss the claim? So I think if you're asking about... If there's a lowball offer by the shipper, could they choose that? What if that is an unreasonable rate? Does the reasonableness requirement of Chapter 39 constrain the Board, or can they choose an unreasonable rate? So there are a few different levels to that. The quick answer to the last question you asked is, as a formal matter, no. 10701D does not apply to the rates that the Board itself sets as prescriptions. That's the DC Circuit holding in the 2009 CSX case. It doesn't really matter. The Board has said it's not going to impose an unreasonable rate. And there are two layers of protection, at least, for preventing that from happening. The first is that the only way you get to the remedy stage is if the shipper has already won at the merit stage using that same methodology. So if that methodology produced a rate for which there was no conceivable rational justification, the shipper's not going to win. You won't even have to get to the remedy stage. And the second layer of protection, then, is this sort of escape valve in the Board's regulation that says that if there is no support for the offer, then the Board will dismiss the case at the remedy stage. That would apply, I think, at a scenario where there was just no conceivable rational justification for the offer that the shipper proposes. So to be clear, there is statutory authorization to choose the rate, and there are very few implementation details in the statute. It's like Congress left that up to the agency. It might be a problem, of course, if that 4 violates some other provision of the statute. But the railroads haven't shown that it does. You know, they have a few different textual hooks, but none of them quite work. The first is this due consideration idea in 10-704-D2. And there are two main problems with that, the first being that it doesn't apply at the remedy stage. You know, that's what the statute expressly says, and that's what the D.C. Circuit held, again, in that 2009 CSX case from the D.C. Circuit. The railroads don't really have a response to that, on the merits at least. They say that the Court shouldn't consider that argument because the Board didn't articulate it in the final decision, invoking this principle from Chainery 1. I want to be clear that that's just a misstatement of the law. Chainery 1 applies to agency determinations of policy or federal— Let me take you through a hypothetical for a second, and stay with me if you can. I'll try. Let's say the—maybe you are. The shipper is charging $100. The Board finds that to be unreasonable. Okay, so now we're at the remedy stage. The shipper offers—the Board, applying long canon, would have found that $98 is the highest maximum reasonable rate in the interest of the public. The shipper comes in at $99 as its final offer. And, excuse me, the carrier comes in at $99. The shipper comes in at $2. The Board, believing $98 is reasonable, is forced to take the $2 offer? No. That would not be how that works. I think that's the example that we—the railroads use that we explained in the last section of our brief. What's the— Because I thought this was kind of binding, you know, last offer. What would the Board do in that situation? I mean, I think in that situation, I can't say exactly what the Board would do. I don't want—I can't bind a future Board. This is kind of abstract. But chances are, I think it would pick $100. Isn't the—no, the $100 was deemed to be unreasonable. It would go with the railroad's offer because it's closer to, I guess, the rate that the Board would have chosen on its own. Really? Because that's not my understanding of the way FORR works. If it believes $98 is reasonable, but the shipper comes in at $99, still unreasonable. So I don't think that that's— Excuse me, the carrier—and I keep screwing that up. If the carrier comes in at $99, shipper's at $2, the long factors would suggest $98. $99 is above $98. Can't take that one. Got to take one of the two. So I just don't think it's really conceivable that the long canon factors would uniquely determine that, like, $99 is okay, but $98 isn't. I mean, these are non-exclusive factors. I think that's their argument of the problem with this system and why it's not authorized by this statute, because it takes out long canon and all the other factors that need to be considered. I think that the Board would consult long canon and various other statutory factors in deciding which of the two proposals best accomplishes those goals. I think it's clear in your example that the railroad's offer, which is only $1 off from what the Board ideally would have chosen, best accomplishes those goals. There's nothing in the statute or anything in FORR that would— says just because the Board maybe ideally would have gone $1 lower, it can't go with the offer that's $1 higher. And to be clear, I don't think this is a very realistic model of how the Board's going to be making these decisions. I don't think it's going to sit down and think, like, well, if we weren't doing FORR, what would the answer be? I think the Board is going to consult the parties' offers and consider them in light of the appropriate factors and decide which one best accomplishes the goals. In your example, Judge Gronder, I think that would clearly be the carrier's offer. So, I mean, I think that the other statutory books, there's really not a lot there. The railroad, they're saying the statute says things that it really just doesn't say. Obviously, needs of the public is basically the most general statutory language you can imagine. There's not a specific policy prescription in there one way or the other. I do want to touch on this idea— I think what the railroad's problem with this is that there would be under FORR, there would be no determination of the 98 part of my hypothetical. In other words, the Board is no longer required to do that determination to come up with the 98, which I put into my hypothetical. I think that's the problem here. So I think it's correct to say that the Board would not have to, say, make a finding of the form. If we were not using FORR, this is what we would choose. I don't think that's required by the regulation. But I also don't think that it's required by the statute or by the APA or anything. Why not? Because they argue that's your job. The Board's job is to use long canon and all the other factors to determine the highest maximum rate in the best interest of the public. And that by doing this FORR procedure, they're not going to have to do that. I think they are going to have to decide which of the two offers best achieves the public goals. And the comparison, by the way, is not between a world where there's no FORR and people can bring rate cases that are small easily and the Board gets to choose on its own. If there's no FORR, there's no rate case. But the point Mr. Dupree makes that was at least interesting to me is, what if the Board really believed that the proper number was in between the two? I just — This procedure prevents it from picking that number. I just don't think that there is a correct outcome uniquely determined by the statute. And I think that the railroads largely concede this in page 25 of their brief. But the statutory factors are non-exclusive and as a practical matter, probably will make up very little of the Board's actual analysis. Like the Board actually said, the long canon one, that's aimed at preventing the railroads from setting the rate too low. That's not really going to come up, I think, very often. So how does one determine what the rate-setting methodology is under this? The Board decided not to specify or require a particular methodology. So the parties can come in and they can propose methodologies that they want. It could be existing methodologies or new ones. But the Board is not going to specify in advance what they are. If the parties propose methodologies that don't work, of course the Board would not be obligated to go with those. This is just a normal exercise of the Board's discretion under Chainery 2 to decide what the reasonableness of a rate standard should be via adjudication rather than rulemaking. So the railroad describes that as a choose-your-own-adventure methodology. Are there any statutory factors that would constrain the methodology chosen by the Board to avoid the vagueness problem? I think it's the case that any methodology the Board chooses is going to have to be explained and going to have to be consistent with the statute. And if a party proposed a methodology that didn't work like that, that party would likely lose. And I think it's – I want to be clear that there is a body of case law that governs agency adjudications to the extent to which they need to be consistent over time. And that body of case law still applies to 4. If the Board in one 4 case were to use a methodology that is inconsistent with a methodology used in a prior 4 case, the Board would need to grapple with that and explain the difference or decide not to go with that inconsistent methodology. So the idea that the Board can just careen from one methodology to another, from case to case, there's nothing in 4 that authorizes that. And I don't know that the Board even could authorize that because it has this reasoned decision-making requirement to make sure that its decisions are consistent. But will that methodology change from case to case or potentially? Because it's – there won't be something disclosing it ahead of time? So the methodology could change from case to case, but the reasoning can't be inconsistent or to the extent that it is inconsistent, it would need to be explained. You know, it's not inconsistent to say this is a standard that can be met in one of two different ways or one of three different ways. So the methodologies could be different. They just have to be self – they have to be consistent over time. The concern that they won't be is not a real concern from the railroads. You know, the last one, the relief cap, the railroads are trying to lock the Board in to $250,000, but the railroad gave – the Board gave a good explanation of why it didn't want to follow that previous approach, and the railroads don't really challenge it. And so I think ultimately there's just not a lot in the statute that prohibits this from happening. The Board has broad authority to prescribe the maximum rate, and there's not an actual textual basis that the railroads have that would stop that from happening. So unless there are further questions, I would take the Court's time and urge that the petitions to review be denied. Thank you, Mr. Vanden Heuvel. Mr. Dupree. Just a few quick points, Your Honor. First, Judge Grunder, you're exactly right on how the statute works. In other words, if the error in Your Honor's hypothetical and the Board determines that, say, anything north of $98 is an unreasonable rate, the Board, by law, cannot accept the railroad's $99 offer because that's unreasonable. They can't accept and enforce an unreasonable offer. Hence, all they are left with is the shipper's $2 offer. So they would take it. I think the real problem is they'll never determine the $98. Well, that's another problem, Your Honor, and I thought it was actually very telling when my friend was responding to Your Honor's questions, and you put that very fair question to him about, well, what if the Board decides the right answer is $98? And he said, well, the Board would be careful not to even think or exercise its own judgment about what the right answer is. I mean, I should go without saying I don't think that's an approach that the Federal judiciary should encourage agency officials to take, to willfully blind themselves to the law and refuse to decide what the law is. I'm sorry, Your Honor. Let me address that a little bit further. So wouldn't the Board necessarily have to choose at least a range in order to determine which of the two bids to choose? You would think the way the Board has to do this is, if the threshold determination is, is the charged rate excessive? In other words, is it unreasonable? They have to, I think, necessarily make a determination as to, well, what is the reasonable rate that this charged rate exceeds? And once they've made that, they've made Judge Grinder's decision. They have determined that this is the maximum reasonable rate when you take into account the long-cannon factors, you take into account the public interest, and they would have reached that decision. And yet, under their rule, they cannot actually enforce what they think the law requires. That's the perverse aspect of the scheme, Your Honor. With regard to Your Honor's questions about vagueness, my friend said, well, this is just straight-up common law adjudication. You know, we've got a vague statute, and the Board is entitled to make its determinations in every case. You know, I suppose the analogy would be, say, to the Sherman Act, where you've got another broad statutory reasonableness mandate, and, well, courts do that all the time. But here's the difference, Your Honor. In the Sherman Act cases, and in pretty much every other body of law I can think of, prior decisions are binding. The reason why there's not a vagueness problem with the Sherman Act and others is because over time courts have fleshed out the contours of a broad statutory mandate through binding decisions, or through legislative rules, but through binding decisions that bind successor courts so regulated parties understand what the legal standard is. That's the antithesis of what 4 does. With 4, every case, the world begins anew. Counsel said, oh, yeah, well, in the first 4 case, the Board may decide to adopt one methodology, which is the legal standard. The Board may adopt one legal standard, but then in the next case, that's a race from the White Board, and they can come up with a brand-new standard, or a brand-new standard in the third case. That is the precise opposite of common law development and doctrine, where courts are bound by what their prior courts have said, and it's that binding aspect of the adjudications that provides the constitutionally requisite fair notice. Let me close on one final point. My friend said there's nothing in 4 that prohibits, there's nothing in the statutes that prohibits the Board from doing what it's doing here. I want to return to my original point. When we had our last case, it was, again, Union Pacific versus STB before this court several years ago, and this court struck down the STB's rulemaking as an excess of its statutory authority. This court began its decision by quoting the Supreme Court's decision in City of Arlington, where it said the task before a court is to determine whether the federal agency has been granted authority not just to make a particular rule, but in the particular manner that the agency adopted. That's where it goes wrong here. There is no statutory mandate from Congress for the Board to decide these cases using a baseball arbitration procedure. Thank you, Mr. Dupree. The court thanks both counsel for the argument you provided to the court this morning. We will continue to study the matter and make a decision in due course. Counsel may be excused.